## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-cr-264 (RC)** |
| **v.** | : | |
| | : | |
| **JORDAN BERK,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Jordan Berk, to 14 days of incarceration followed by 36 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

### I.      Introduction

Defendant Jordan Berk, 43, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Berk pleaded guilty to a violation of Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1).  The government's recommended sentence of 14 days of incarceration followed by 36 months of supervised release, and $500 in restitution, is supported by Berk's planning and coordination with others in advance of the January 6, 2021 riot, his breach of the Senate Wing Door, and his entry into office space.  The government's recommendation also takes into account Berk's general candor with investigators in this matter and his prompt acceptance of responsibility after being charged in this matter.

The Court must also consider that Berk's conduct on January 6, like the conduct of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings.  But for his actions alongside so many others, the riot likely would have failed.  Here, the facts and circumstances of Berk's crime support a sentence of 14 days of incarceration, 36 months of supervised release, and $500 in restitution.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol summarized in the Statement of Offense in this case.  *See* ECF No. 24 at ¶¶ 1–7.

### Berk's Role in the January 6, 2021 Attack on the Capitol

Jordan Berk anticipated the riot at the U.S. Capitol on January 6, 2021 well in advance of the riot itself.  In the fall of 2020, Berk participated in a Telegram group entitled "PATRIOTS[45] MAGA Gang" ("Patriots 45").  The group, initially created to bring together supporters of then-

---

million) as reflected in this memorandum.  However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

President Trump in the lead-up to the 2020 presidential election, became a breeding ground for plans for violence against the seat of the federal government.[2]

Within the Patriots 45 Telegram group, Berk sent a series of messages discussing his view that the 2020 presidential election was stolen and his expectation that "patriots" would "storm the gates" following the election results. *See* ECF No. 24 at ¶ 8; Exhibit 2. These messages began almost as soon as the election results came in. For example, on November 4, 2020, the day after the 2020 presidential election, Berk wrote to the Patriots 45 Telegram group, "So are we getting this election stolen from us or what?" *See* Exhibit 1; ECF No. 24 at ¶ 9. In another message that same day, Berk wrote, "I envision 20 million patriots driving to D.C. to storm the gates if they call it for Joe." *See* Exhibits 2 & 3; ECF No. 24 at ¶ 9.[3]



*Exhibit 2*

---

[2] The group was organized by Daniel Rodriguez and Edward Badalian, who were previously convicted for their role in the riot at the U.S. Capitol on January 6, 2021. *See United States v. Daniel Rodriguez, et al.*, 21-cr-246 (ABJ).
[3] Messages from Berk appear in the sentencing exhibits under a teal label: "Deleted Account."

As the days went on, Berk continued anticipating and embracing expected political violence. On November 5, 2020, Berk stated in the Telegram group, "Don't forget that Trump is pro[p]hesized to be the LAST American president no matter what happens." *See* Exhibit 4. On November 9, 2020, Berk stated, "[I] hear that Ali Alexander is putting together a west coast storming of Silicon Valley. While eastern peeps are going to DC." *See* Exhibit 5. That same day, Berk shared a post with the headline, "Trump plans to hold rallies to lead his followers in a 'war' to stop Biden from taking office." *See* Exhibit 6. On November 16, 2020, another individual wrote to the group, "Civil war is coming folks." Berk responded, "Nah it's here." *See* Exhibit 7; ECF No. 24 at ¶ 10.

Throughout much of December, Berk remained focused on the claim that the election was stolen, and his desire to take action. On December 14, 2020, Berk shared a post from another account, which included the following headline, "IT'S HAPPENING: President Trump Issues Warning – Swing States that Found MASSIVE VOTER FRAUD, which is all of them, CANNOT LEGALLY CERTIFY these votes." *See* Exhibit 8. On December 21, 2020, Berk shared a post from another account, which included the headline, "Patriots Storming Oregon State Capitol Building Demand Voter Integrity – Met With Police Violence." *See* Exhibits 9 & 10.

On December 19, 2020, then-President Trump shared a Tweet with the following message: "Peter Navarro releases 36-page report alleging election fraud 'more than sufficient' to swing victory to Trump https://t.co/D8KrMHnFdK. A great report by Peter. Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th. Be there, will be wild!" Shortly thereafter, discussions in the Patriots 45 Telegram group turned to plans for members of the group to come to Washington, D.C. on January 6, 2021. On December 21, 2020, Daniel Rodriguez, one of the organizers of the group, repeatedly urged Berk to travel to Washington, D.C. for January 6,

2021. *See* Exhibit 11. Berk responded that he would go to Washington, D.C., but—in one of his first breaks with the group's leaders and in recognition of the dangers of traveling to Washington, D.C.—Berk argued that the group should discourage another individual, who was not present in the Telegram group, from attending. Berk wrote, "I already went." *See* Exhibit 12. He continued, "And you know I'll go again…and again," but, he continued, "I just don't want *everyone* there." *See id.*

While Berk made many statements indicating he was generally aligned with the Patriots 45 Telegram group, late in December 2020, Berk began to more aggressively speak in dissent against the group's organizers—Daniel Rodriguez and Ed Badalian—with whom he did not personally get along. For example, on December 22, 2020, Berk wrote to the group, "I don't identify with people who think they are some sort of MAGA gang." *See* Exhibits 13 & 14. Berk's comments of dissent and disagreements with the organizers of the Telegram group ultimately led to his removal. Specifically, on December 22, 2020, Berk was involved in a series of disagreements in the Patriots 45 Telegram group with Badalian. In those disagreements, Berk made reference to "soon-to-be-ex-President Trump." *See* Exhibit 15. Badalian responded, "soon as in 4 years from now." *See id.* Berk responded, "We shall see." *See id.* Badalian responded, "nah. We shall act." *See id.* Berk replied, "Protests dont get people elected." *See* Exhibit 16. Badalian responded, "Youre an American, reject the label if you want, but you are part of this movement." *See id.* Berk replied, "Sure but I'm part of the movement with a healthy skepticism." *See id.* When Badalian called for the group to engage in tactical training to prepare for "a firefight with armed terrorists," Berk responded, "Let the 3%ers handle that." *See* Exhibit 17. Badalian responded, "we are the 3 percent." *Id.* Berk replied, "No we most definitely arent." *See* Exhibit

18.  A few hours later, Badalian removed Berk from the Patriots 45 Telegram group.  *See* Exhibit 19.

Nonetheless, Berk continued to plan for Washington, D.C.  His cell phone reflected calendar entries to be at the "Capitol Building" on January 6, 2021 at 1:00 p.m.  *See* ECF No. 24 at ¶ 11.  His phone included an image further documenting his plan to go to the Capitol on January 6, 2021.



A review of the U.S Capitol's CCTV footage reveal footage of Berk inside the U.S. Capitol building.  At approximately 3:07 p.m., Berk entered the U.S. Capitol building through the Senate Wing Door.  *See* Exhibit 20.



*Exhibit 20*

After entering through the Senate Wing Door, Berk traveled south, toward the Crypt and stopped in an office, off of the hallway leading to the Crypt, where he eagerly engaged with other rioters. *See* Exhibit 21 (17:12–17:24). In recognition that Berk knew his conduct was unlawful, when another rioter asked his name while recording a video, Berk responded, "Who am I? I'm anybody. I'm nobody." *Id.*



*Exhibit 21*

Berk exited the office and returned to the area of the Senate Wing Door, by approximately

3:14 p.m.  *See* Exhibit 22.  When police had established a police line and began forcing the rioters

back out of the building, Berk exited back through the Senate Wing Door at approximately 3:16

p.m.  *See id.*





*Exhibit 22*

*The Charges and Plea Agreement*

On March 4, 2024, the United States charged Berk by a four-count complaint with violating 18 U.S.C. § 1752(a)(1) (Count One), 18 U.S.C. § 1752(a)(2) (Count Two), 40 U.S.C. § 5104(e)(2)(D) (Count Three), and 40 U.S.C. § 5104(e)(2)(G) (Count Four). *See* ECF No. 1. On May 29, 2024, the United States charged Berk with the same four offenses in a criminal Information. On June 27, 2024, pursuant to a plea agreement, Berk pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). *See* ECF No. 23. By his plea agreement, the defendant also agreed to pay $500 in restitution to the Architect of the Capitol. *See id.*

### III.    Statutory Penalties

Berk now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to one year of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea

agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Zero-Point Offender Adjustment | -2 |
| Total Adjusted Offense Level | 2 |

*See* ECF No. 26 ("PSR") at ¶¶ 39–48.

While the Government concedes that Section 4C1.1 applies to Berk, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United*

*States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus, Berk's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sent. Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT. COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), *available at* https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Berk's criminal history as a category I. PSR at ¶ 51. Accordingly, the U.S. Probation Office calculated Berk's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 108. Berk's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation, with the exception of the adjustment under Section 4C1.1, which the parties did not expressly reach agreement on. *See* ECF No. 23 at 3.

Here, while the Court must consider the Section 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration, 36 months of supervised release, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States*

*v. Judd*, 21-cr-40, 2021 WL 6134590, at \*5 (D.D.C. Dec. 28, 2021).  While assessing Berk's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.  Notably, for a misdemeanor defendant like Berk, the absence of violent or destructive acts is not a mitigating factor.  Had Berk engaged in such conduct, he would have faced additional criminal charges.

One of the important factors in Berk's case is his participation in a group organizing for January 6, 2021.  Berk's statements—including those as early as November 4, 2020, anticipating "patriots [traveling] to D.C. to storm the gates," *see* Exhibits 2 & 3; ECF No. 24 at ¶ 9—are alarming considering that is exactly what Berk and other members of the Patriots 45 Telegram group did.  Berk's statements, however, are tempered by his eventual dissent within the group— that is, while Berk voluntarily joined the group and at times spoke in a manner consistent with its purpose, he also rejected calls from the group's organizers to engage in tactical training or to identify as Three Percenters.  *See* Exhibits 13–19.  Berk's statements of dissent—which appear to be motivated as much by a personal distaste for the group's organizers as by ideological objections—are unique within the Patriots 45 Telegram group.  Nonetheless, Berk still participated in the riot at the U.S. Capitol building, including by breaching the Senate Wing Door and traveling throughout the Capitol.  Berk's breach of the Capitol grounds and the building were unacceptable and helped the riot succeed.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days of incarceration in this matter.

## B.  Berk's History and Characteristics

Berk has no criminal convictions, arrests, or pending charges.  And to his credit, after he was approached by the FBI, Berk took a cooperative posture, sat with the FBI for a lengthy proffer

in which he was generally candid and forthcoming, and voluntarily provided his cell phones. Likewise, shortly after being charged in this case, Berk accepted responsibility and pleaded guilty based on his conduct.

The remainder of Berk's history and characteristics reflect that Berk was raised in a family environment with stable family support, *see* PSR at ¶¶ 57–64, is in good health, *see* PSR at ¶¶ 67– 74, and has had generally stable employment, *see* PSR at ¶¶ 86–93.

### C.  The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence To Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B–C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred."  Statement of Judge Nichols at Sentencing, *United States v. Thomas Gallagher*, 1:21-CR-41, Sent. Tr. 10/13/2021 at 37.

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Berk's lack of criminal history, prompt acceptance of responsibility, and cooperation with the government in this investigation suggest that, while specific deterrence is always a factor that must be considered, the need for specific deterrence in this case is less serious than in others. Nevertheless, given the seriousness of the offense, and the fact that Berk engaged in the conduct knowing it was wrong, suggests that a term of 14 days' incarceration is appropriate in this case. The Court must convey to Berk that criminal actions have consequences.

### E.  The Need To Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4]  This Court must sentence Berk based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Berk has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Chad Suenram*, 23-cr-290 (ACR), the defendant entered the Capitol twice—first through the Senate Fire Door, and then through the Senate Wing Door—and spent approximately 35 minutes inside. Near the North Door, he was at the front of a line of rioters confronting officers and cheered when police retreated inside the building. Berk entered the Capitol only once and spent less time inside the building than did Suenram. But unlike Suenram, Berk entered an office, which places him in a more serious category of offenders than defendants who remained in public spaces. Suenram was consistently less than candid than Berk when interviewed by FBI agents, and repeatedly balked to entering a guilty plea before he eventually pleading guilty to violating 18 U.S.C. § 1751(a)(1). Although Berk was cooperative with the FBI, Berk engaged in aggravating pre-January 6 conversations and planning in the Patriots 45 Telegram group—conduct that was not present in Suenram's case. The Court in *Suenram* imposed 14 days of intermittent confinement as a condition of 36 months' probation, even though Suenram is the sole parent of five children, including a child with severe behavior issues from the foster system.

The facts of this case are also similar to those in *United States v. Mark Nealy*, 23-cr-278 (TSC), where the defendant pleaded guilty to violating 40 U.S.C. § 5104(e)(2)(G).  Nealy entered the Capitol building shortly after the breaches on the Upper West Terrace.  Nealy walked around the interior of the Capitol building and was in the Capitol building for approximately 13 minutes— similar to Berk's 9 minutes inside the Capitol.  Judge Chutkan sentenced Nealy to 14 days of incarceration, due to Nealy's conduct on January 6 and lack of respect for the law, as demonstrated by his January 6 conduct and prior conviction for involuntary manslaughter DUI.

*United States v. Dennis Adams,* 23-cr-396 (TSC) also provides a useful comparator. Adams pleaded guilty to violating 18 U.S.C. § 1752(a)(1), and was sentenced by Judge Chutkan to 45 days of incarceration.  Adams entered the Capitol building twice—through the Fire Door and then through the Senate Wing Door—and then remained on the Capitol grounds for approximately three hours.  On the grounds, Adams joined rioters who overwhelmed police officers by the North Door.  Adams, like Berk, accepted responsibility quickly.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."  *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).  The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."  *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).  "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5]    Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b).    At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3).    *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.    The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Berk must pay $500 in restitution, which reflects in part the role Berk played in the riot on January 6.[6]    *See* ECF 23 at Plea Agreement at 8.    As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05"

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss."  18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Berk's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 126.

## VII.    Fine

Berk's conviction for a violation of 18 U.S.C. § 1752(a)(1) subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider Berk's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The Guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e).

The burden is on Berk to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, Berk has not shown an inability to pay. *See* PSR at ¶¶ 94–104. Thus, pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200 to $9,500 U.S.S.G. § 5E1.2(c). *See* PSR at ¶ 124.

## VIII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Berk to 14 days of incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution. Such a sentence

19

protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Berk's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Anthony W. Mariano*
ANTHONY W. MARIANO
MA Bar No. 688559
Trial Attorney, Detailee
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, D.C. 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov

</div>